1   **BAKER BOTTS L.L.P.**
    Bryant C. Boren, Jr. (SBN 260602)
2   bryant.c.boren@bakerbotts.com
    Eliot D. Williams (SBN 290780)
3   eliot.williams@bakerbotts.com
    Kevin E. Cadwell (SBN 255794)
4   kevin.cadwell@bakerbotts.com
    Jon V. Swenson (SBN 233054)
5   jon.swenson@bakerbotts.com
    Elizabeth K. Boggs (SBN 280555)
6   elizabeth.boggs@bakerbotts.com
    1001 Page Mill Road, Building One
7   Palo Alto, CA 94304
    Telephone: 650.739.7500
8   Facsimile: 650.739.7699

9   Russell J. Crain (*pro hac vice*)
    russ.crain@bakerbotts.com
10  Brian D. Johnston (*pro hac vice*)
    brian.johnston@bakerbotts.com
11  2001 Ross Avenue
    Dallas, TX 75201
12  Telephone: 214.953.6500
    Facsimile: 214.953.6503

13  *Attorneys for Defendants and Counterclaimants*
    *AT&T MOBILITY LLC and AT&T MOBILITY II LLC*
14

15          **UNITED STATES DISTRICT COURT**
16          **CENTRAL DISTRICT OF CALIFORNIA**

17  ENOVSYS LLC,                          Case No.: 2:11-CV-05210-FMO(AGRx)

18          Plaintiff,                    **MEMORANDUM OF POINTS AND**
                                          **AUTHORITIES IN SUPPORT OF**
19      vs.                               **AT&T'S MOTION TO EXCLUDE**
                                          **DR. ROSE'S OPINIONS ON AT&T'S**
20  AT&T MOBILITY LLC and AT&T            **INFRINGEMENT AND VALIDITY**
    MOBILITY II LLC,                      **OF THE '461 PATENT AND THE**
21                                        **'273 PATENT**
            Defendants.
22                                        **[REDACTED]**

23  AT&T MOBILITY LLC and AT&T
    MOBILITY II LLC,
24                                        Hearing Date: March 21, 2014
            Counterclaimants,            Hearing Time: 10:00 AM
25
        vs.
26                                        Honorable Judge Fernando M. Olguin
    ENOVSYS LLC,
27                                        **Trial Date: April 8, 2014**
            Counterdefendant.
28

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................ 1

II.  LEGAL STANDARD................................................................... 2

III. ARGUMENT .............................................................................. 2

    A.   Dr. Rose's Infringement Opinions Should Be Excluded Because He Bases His Opinions on Speculation about How the AT&T Network Operates and He Ignores Evidence That Contradicts Those Speculative Opinions ...................... 2

        1.   Dr. Rose Did Not Consider Whether AT&T's SUPL Servers Implement the Features of the SUPL Standard Relied Upon in His Infringement Analysis....................................4

        2.   Dr. Rose Did Not Consider Whether AT&T Actually Uses an "Advice of Privacy SMS" ............................7

        3.   Dr. Rose Merely Assumes Infringement of Claim 1 of the '273 Patent....................................................8

    B.   Dr. Rose Failed To Apply the Correct Legal Standard in Analyzing Infringement of Method Claims............................................. 10

    C.   Dr. Rose Did Not Employ a Reliable Methodology in Selecting the Three Items That He Concludes Are "a Code" Satisfying the Court's Construction of "Preauthorized".............................. 12

    D.   Dr. Rose's Opinion Should Be Excluded Because He Improperly Relied on Dr. Gruteser's Opinions ......................................... 16

    E.   Dr. Rose's Opinion Is Conclusory and Lacks Explanation or Support .. 18

    F.   Dr. Rose Failed To Apply the Correct Legal Standards In Analyzing Invalidity .............................................................. 21

        1.   Dr. Rose Conflates the Legal Standards for Anticipation and Priority ............................................................21

        2.   Dr. Rose Improperly Applies a Standard for Infringement Different from That for Invalidity.................................22

        3.   Dr. Rose's Applies the Wrong Legal Standard for Commercial Success........................................................23

G.   Dr. Rose Is Not Qualified As an Expert Regarding Practice Before the Patent Office ......................................................................................... 24

IV.  CONCLUSION ............................................................................................ 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

Page(s)

Cases

*6816.5 Acres of Land, Etc., Rio Arriba Co., N.M. v. United States*,
411 F.2d 834 (10th Cir. 1969) ............................................................. 17

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
239 F.3d 1343 (Fed. Cir. 2001) ........................................................... 22

*American Key Corp. v. Cole Nat. Corp.*,
762 F.2d 1569 (11th Cir.1985) ............................................................ 17

*Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*,
709 F.3d 1348 (Fed. Cir. 2013) .............................................. 10, 12, 18

*Barber v. United Airlines, Inc.*,
17 F. App'x 433 (7th Cir.) .............................................................. 4, 10

*Bourjaily v. United States*,
483 U.S. 171 (1987) ............................................................................. 2

*Daubert v. Merrell Dow Pharms., Inc.*,
43 F.3d 1311 (9th Cir. 1995) .............................................................. 15

*Daubert v. Merrill Dow Pharm.*,
509 U.S. 589 (1993) ................................................................... *passim*

*Fail-Safe, LLC v. A.O. Smith Corp.*,
744 F. Supp. 2d 870 (E.D. Wis. 2010) ................................................. 4

*General Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ....................................................................... 3, 18

*In re Silicone Gel Breast Implants Products Liab. Litig.*,
318 F. Supp. 2d 879 (C.D. Cal. 2004) .................................................. 2

*Keegan v. American Honda Motor Co., Inc.*,
284 F.R.D. 504 (C.D. Cal. 2012) ........................................................ 12

*Kennedy v. Collagen Corp.*,
161 F.3d 1226 (9th Cir. 1998) ............................................................ 24

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999) ........................................................................ 2

*Lewmar Marine, Inc. v. Barient, Inc.,*
    827 F.2d 744 (Fed. Cir. 1987) ........................................................ 22

*Lucent Techs., Inc. v. Gateway, Inc.,*
    580 F.3d 1301 (Fed. Cir. 2009) ..................................................... 10

*Minasian v. Standard Chtd. Bank, P.L.C.,*
    109 F.3d 1212 (7th Cir. 1997) ....................................................... 15

*Minix v. Canarecci,*
    597 F.3d 824 (7th Cir. 2010) ......................................... 12, 18, 20

*Muniauction, Inc. v. Thomson Corp.,*
    532 F.3d 1318 (Fed. Cir. 2008) ..................................................... 10

*Ormco Corp. v. Align Tech., Inc.,*
    463 F.3d 1299 (Fed. Cir. 2006) ..................................................... 23

*U.S. Gypsum Co. v. Lafarge N. Amer.,*
    670 F. Supp. 2d 737 (N.D. Ill. 2009) ...................................... 10, 21

*United States v. 99.66 Acres of Land,*
    970 F.2d 651, 657 (9th Cir. 1992) ................................................ 17

*Vas-Cath, Inc. v. Mahurkar,*
    935 F.2d 1555 (Fed. Cir. 1991) ..................................................... 21

*Wells Fargo Bank N.A. v. LaSalle Bank Nat. Ass'n,*
    No. 08-CV-1448, 2011 WL 743748 (D. Nev. Feb. 23, 2011) ......... 17, 18

**OTHER AUTHORITIES**

Fed. R. Evid. 702 ...................................................................... *passim*

# I. INTRODUCTION

The opinions of Dr. Christopher Rose—including that AT&T infringes the asserted patents and that those patents are not invalid—fail the admissibility test of Rule 702 in several independent respects.

His infringement opinion is based on unsupported speculation, rather than "sufficient facts or data." Fed. R. Evid. 702(b). Dr. Rose admits that he does not know critical details regarding the operation of AT&T's network and performed no testing to confirm his opinions. He cherry-picks the evidence from which he speculates, turning a blind eye to the relevant documentation and testimony of AT&T's engineers about the actual operation of the network to the extent it contradicts his preferred conclusions. Similarly, Dr. Rose adopts and incorporates the entire opinion of Dr. Gruteser regarding the operation of the relevant smartphones and applications. Yet Dr. Rose performed no independent investigation of those smartphones and applications and has no way of evaluating the correctness of Dr. Gruteser's opinions. The two never communicated regarding this case, and Dr. Rose did not know even the most basic aspects of Dr. Gruteser's methodology.

Dr. Rose's opinions also fail to apply "reliable principles and methods" and do not "help the trier of fact" Fed. R. Evid. 702(a), (c). In numerous instances, Dr. Rose bases his analysis on an incorrect legal standard. He offers no explanation of the methodology he applied in selecting scattered pieces of data to satisfy "a code," as required by the Court's construction of "preauthorized." His arbitrary selections result from litigation-motivated cherry-picking rather than sound technical methodology. And Dr. Rose's opinions are littered with conclusory assertions devoid of any analysis or explanation. Such unadorned conclusions do not assist the trier of fact and provide no basis upon which to assess the reliability of his methodology.

In short, Dr. Rose's opinions are speculative and conclusory, take an impermissibly selective view of the evidence, and rest on unreliable methodology. Rule 702 compels the exclusion of such faulty testimony.

**II. LEGAL STANDARD**

Under Rule 702 of the Federal Rules of Evidence, scientific, technical, or other specialized knowledge must "assist the trier of fact to understand the evidence or to determine a fact in issue" in order for such testimony to be admissible. Fed. R. Evid. 702. In addition, the expert's testimony will be admissible only if it is the product of reliable principles and methods applied reliably to the facts of the case. Fed. R. Evid. 702. In applying these standards, district courts are charged to act as "gatekeepers" to ensure that expert testimony is relevant and reliable. *Daubert v. Merrill Dow Pharm.*, 509 U.S. 589 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). To that end, "any step that renders the expert's analysis unreliable renders the expert's testimony inadmissible." *In re Silicone Gel Breast Implants Products Liab. Litig.*, 318 F. Supp. 2d 879, 890 (C.D. Cal. 2004) (internal indicia of quotation omitted). The party who proffers the expert testimony bears the burden of demonstrating its admissibility. *Milos Misha Subotincic v. 1274274 Ontario Inc.*, SACV 10-01946 AG, 2013 WL 3964994 at *12 (C.D. Cal. Apr. 9, 2013) (citing *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987)). Proffered expert testimony must be found to be properly grounded, well-reasoned, and not speculative before it can be admitted. Fed. R. Evid. 702 Advisory Committee's Notes.

**III. ARGUMENT**

    **A.**    **Dr. Rose's Infringement Opinions Should Be Excluded Because He Bases His Opinions on Speculation about How the AT&T Network Operates and He Ignores Evidence That Contradicts Those Speculative Opinions**

Dr. Rose intends to offer his opinion that AT&T's network infringes the asserted claims of the patents-in-suit. Yet Dr. Rose has admitted that he simply does not know how AT&T's network operates. He did not perform any testing of

the network.  Swenson Decl., Ex. R at 486:20-25.[1]  He did not review any source code for the relevant servers in the network or for the accused handsets on the network.  *Id.* at 272:11-16.  He did not attend—and largely disregarded—the depositions given by AT&T's engineers with knowledge of the accused system.  *Id.* at 274:11-276:2.

Instead, Dr. Rose relies on design documents and industry standards without having undertaken any analysis to determine which portions of those documents and standards are actually implemented in AT&T's accused network.  His opinion that the AT&T network—as actually implemented—infringes the asserted claims is thus pure speculation, belied by the uncontroverted testimony of competent witnesses.  Dr. Rose's subjective belief and unsupported speculation as to how the AT&T network operates are not "sufficient facts or data" under Rule 702(b).  Nor can it pass muster under *Daubert*.  "[T]here is simply too great an analytical gap between the data and the opinion proffered" because Dr. Rose provides no analysis linking the standards and designs to the actual operation of the accused system.  *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert").

Dr. Rose ignores the relevant evidence that contradicts him: He relies on features from design documents and industry standards ███████████ ████████████████████████████████ Dr. Rose either did not consider the testimony of AT&T's engineers or chose to disregard the portions of their testimony that did not suit his opinion, neither of which is a reliable methodology for an expert to employ in assessing infringement.  Dr. Rose was not free simply to ignore evidence that contradicts his preferred conclusion.  An expert may not pick and choose the facts she finds helpful and pretend that the others do

---

[1] Hereinafter, all citations are to exhibits attached to the Declaration of Jon V. Swenson in Support of Defendants' Daubert Motions and Motions in Limine.

not exist. *Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir.) (unpublished) (affirming exclusion of testimony where expert "cherry-picked the facts he considered" because "such a selective use of facts fails to satisfy" the standard of Rule 702); *see also Fail-Safe, LLC v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 889 (E.D. Wis. 2010) ("[T]he court also finds the [expert] witness's methodology unreliable because of how [the expert] uniformly treated all evidence that undermined his underlying conclusion: unwarranted dismissal of the evidence or outright blindness to contrary evidence.").

Both of these flaws independently demonstrate that Dr. Rose's opinion is unreliable. Taken together, they leave no room for doubt. Below are three specific examples of the analytical gaps that permeate Dr. Rose's opinion on infringement.

**1. Dr. Rose Did Not Consider Whether AT&T's SUPL Servers Implement the Features of the SUPL Standard Relied Upon in His Infringement Analysis**

Dr. Rose asserts that "the SUPL server in AT&T's network is generally compliant with the Open Mobile Alliance (OMA) SUPL Architecture." *See, e.g.*, Ex. N at 31-32. He then proceeds to describe how portions of the SUPL standard allegedly infringe, without ever discussing whether AT&T actually adopted those portions of the standard in its SUPL servers. *See, e.g.*, *id.* (citing Open Mobile Alliance standards documents). Dr. Rose employs this same shortcut in analyzing every independent claim of the '461 Patent.[2]

This analytical gap in the report did not result from a drafting error or the inadvertent omission of data. Rather, Dr. Rose simply did not know—and did not care to undertake to learn—which parts of the standard AT&T uses. In fact, he said that he did not believe he needed to know:

---

[2] *See, e.g.*, Ex. N at 45, 58, 73, 82, 101, 115.

Q: Okay. Do you know which component, which portions of [the OMA SUPL] specification the AT&T network complies with and which it does not?

A: I did not go over that, I didn't feel it was necessary to go over that in tremendous detail but, again, I guess I could be asked.

Ex. R at 366:6-11. Dr. Rose was wrong. His failure to ask this critical question and his decision instead merely to *assume* the presence of the allegedly infringing features of the standard in AT&T's network renders his infringement opinion unreliable.

In truth, if Dr. Rose *had* bothered to ask the question, he would not have liked the answer. As AT&T engineer Les Leonard testified, AT&T's SUPL servers do not fully implement the SUPL standard. Ex. J at 35:7-12 ("Q: Do the SUPL 1 servers fully implement the SUPL 1.0 standard? A: No, they do not. Q: Do the SUPL 2 servers fully implement the SUPL 2 standard? A: No, they do not."). ███████████████████████████████████████████ ███████████████████████████ In particular, Dr. Rose's report relies on the standard to conclude that AT&T's SUPL servers must use the SUPL Privacy Function (SPF) to "obtain and apply privacy settings." *See, e.g.*, Rose IR 32, 34. But at his deposition, Dr. Rose was unable to say whether the SPF was actually used by AT&T's network, instead relying on his unsupported assumption that AT&T's servers must do so because they are "generally compliant" with the standard:

Q: . . . [I]s the SSF and SPF functionality part of the AT&T system as implemented?

A: I have to – I have to assume – I shouldn't say I have to assume it is. I'd have to dig. I don't remember specifically, I can't point you to a document right now that says, you know, SSF, SPF, but those are – you know, those are features or parts of a SUPL server. So –

Q: Those are parts of the AT&T SUPL server or those are parts of the hypothetical SUPL server?

A: I love the way you put that, hypothetical SUPL server. There's – you know, to be generally compliant there's, you know, pieces that you usually do but to specifically answer your question, right now I can't point to a specific document that shows SSF and SPF.

Ex. R at 348:9-349:1.  Dr. Rose further admitted that he did not even attempt to identify where the "privacy settings" allegedly obtained and applied by AT&T's SUPL server could be found in AT&T's network.  *Id.* at 364:19-25 ("Q: In preparing your report did you attempt to identify where the privacy settings that you discuss here on Page 34 . . . resided?  A: . . . [W]here resided means, you know, a particular database on a particular server and I did not go into that level of detail I'm almost certain."). ████████████████████████████████████████████

████████████████████████████████████████████████████████

████   ██████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████

Dr. Rose thus merely *assumed* that AT&T used the privacy functionality by virtue of its presence in the standard.  The unreliability of his speculative methodology is only compounded by his selective consideration of the evidence.  Since Dr. Rose relies on the SUPL standard—████████████████████████████

████████████████████—in his analysis of every independent claim of the '461 Patent, this fundamental flaw in his methodology infects his entire opinion regarding infringement of the '461 Patent.

---

[3] Later, under questioning from Enovsys's counsel, Dr. Rose managed to identify a page from a document allegedly supporting his assertion. ████████████████

████████████████████████████████████████████████████████  The text Dr. Rose identified is merely the standards text from a design document, and does not provide a reliable basis to determine which portions of the standard AT&T did and did not use.  *Id.* at 28:17-30:2 ("It was the design architecture only."); 48:4 ("Well, this is the standards text . . . ."); 51:11-12 ("Q: Why does Exhibit-6 describe the SUPL standard call flows rather than the as-implemented call flows? . . . A: I suspect that we use this text because it was available and generally described what we wanted to happen and as we, you know, moved into development, we – you know, we moved through this and said, oh, we don't need to do that, we don't need to do that.").  Dr. Rose's report completely ignores Mr. Leonard's testimony.

## 2. Dr. Rose Did Not Consider Whether AT&T Actually Uses an "Advice of Privacy SMS"

In opining that AT&T infringes Claims 12, 13, 18, and 25, Dr. Rose asserts that AT&T's network sends an "Advice of Privacy SMS to the mobile phone [being located] to notify the subscriber of the location request and receive subscriber authorization" to grant the request. *See, e.g.*, Ex. N at 76. At his deposition, Dr. Rose admitted that he had not actually "looked at software and looked at the code of the system and played with it" to confirm that the AT&T network does so, but instead had seen various "documents that mention advice of privacy." Ex. R at 272:5-273:4. Dr. Rose believed that "it was not necessary to go down to that level of detail." *Id.* at 273:13-274:10.

Dr. Rose's analysis ignores the testimony of AT&T's engineer John Davis and the documentary evidence ███████████████████████████████

███████████████████████████████ Although Dr. Rose stated that he had read Mr. Davis's deposition transcript, he could not recall whether Mr. Davis had testified about advice of privacy. ████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████ *See* Ex. R at 275:21-276:1 ("So I don't see any reference to deposition testimony on Page 74 and 75 [of my report]. . . . It doesn't mean I didn't see any, I just used the best stuff, the stuff that I thought was best in citing.") Likewise, the internal AT&T documents ██████████████████████

█████████████████████ are nowhere discussed in Dr. Rose's report and are not included in the list of materials he considered in forming his opinion. ██████████████

**[REDACTED]**

Dr. Rose's **[REDACTED]** speculation regarding whether AT&T uses Advice of Privacy, coupled with his selective consideration of the relevant facts, renders his opinion on infringement of Claims 12, 13, 18, and 25 of the '461 Patent unreliable.

### 3. Dr. Rose Merely Assumes Infringement of Claim 1 of the '273 Patent

In his infringement analysis of Claim 1 of the '273 Patent, Dr. Rose asserts that "[t]he location server (GW or SUPL server) checks the age of the last known location." Ex. N at 124. But at his deposition, it became apparent that Dr. Rose merely *assumes* that AT&T's network stores and checks a "last known location." Under questioning, Dr. Rose was unable to explain specifically where the "last known location" referred to in his report would be found in AT&T's network. Ex. R at 385:6-9 ("[S]o I can't point to a specific place or places but, you know, it is somewhere in the network meaning this overall app, LBS, AT&T conglomeration. That's the best I can do right now.") Because he did not actually know where this data was stored, he resorted to offering speculation regarding all the places he could "imagine" that it might be stored. *Id.* at 384:16-20 ("I can *imagine* it is in a number of places but I don't have the technical information here to tell you which, exactly in which piece of the overall AT&T network it is stored."); 394:7-11 ("so I could *imagine* that the position might be stored [in the GMLC]"); 383:13-384:1 ("the app on the phone *could* store it, the system *could* store it . . . . It *might* be on the LBS.") (emphasis added).

When directed to particular documents by Enovsys's counsel, Dr. Rose was at last able to identify the purported underpinnings of his analysis. But even then, Dr. Rose admitted that he did not know if the steps described in those design documents *actually occurred* in AT&T's network, which is a necessary prerequisite to infringement of this method claim:

Q: So, Dr. Rose, did you perform any testing of the AT&T network to determine whether any of the call flows that you have described over the last several questions with counsel actually occurred?

A: So I have – I have no access to the AT&T, internal AT&T network and so no.

*Id*. at 486:20-25. And when pressed to say whether the functionality in the design documents that Dr. Rose correlated to the steps of the claimed method had ever actually been performed in the AT&T network, Dr. Rose conceded he did not know:

So I have no way of knowing specifically whether this particular piece of method . . . or algorithm . . . was ever performed . . . . I don't have any direct knowledge of the operations of the AT&T network.

*Id*. at 490:7-24. *Accord Id*. at 493:6-10 ("Q: Now I'm asking you does it actually do it. A: So, you know, the AT&T system, the hardware, all the wires and all that good stuff, computers, I have not verified that . . . .").

Thus, Dr. Rose's infringement theory rests not upon facts or data about how AT&T's network operates, but upon Dr. Rose's speculation. █████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████

These examples demonstrate a clear pattern. Dr. Rose did not determine how the AT&T network actually operates, and he did not base his opinions on the actual operation of the network. Instead, he speculates that it "must" operate in particular ways—that it "must" comply with the SUPL standard and that it "must" not vary from the originally contemplated design—with no basis for doing so, and despite the record evidence to the contrary. This opinion is no better than guesswork and cannot aid the jury in its determination as to infringement. Indeed, he does not even make an effort to justify his guesses as educated guesses—not

that an educated guess would suffice.  And rather than consider or account for the contrary evidence, Dr. Rose stubbornly disregards it as if it does not exist.

Dr. Rose should not be permitted to offer his "subjective belief or unsupported speculation" regarding the operation of the AT&T network to the jury.  *Daubert*, 509 U.S. at 589-90.  Moreover, Dr. Rose's cherry-picking of evidence—ignoring documents and testimony that did not suit his infringement theories—"fails to satisfy the scientific method and *Daubert* and it thus fails to 'assist the trier of fact.'"  *Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001) (unpublished) (quoting Fed. R. Civ. P. 702).  Dr. Rose's infringement opinion is therefore unreliable and should be excluded in its entirety.

### B.  Dr. Rose Failed To Apply the Correct Legal Standard in Analyzing Infringement of Method Claims

An expert's analysis will not "assist the trier of fact" if the expert applies the incorrect legal standard in forming his opinion.  Thus, expert opinions based on a faulty understanding of the governing law should be excluded under Rule 702.  *See, e.g.*, *U.S. Gypsum Co. v. Lafarge N. Amer.*, 670 F. Supp. 2d 737, 744-45 (N.D. Ill. 2009) (precluding expert testimony where expert applied incorrect legal standard).

In this case, Dr. Rose has applied an improper legal standard for analyzing infringement of method claims.  Merely showing that a system is *capable* of performing the claimed method does not show infringement. *See Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 709 F.3d 1348, 1362 (Fed. Cir. 2013).  Rather, "[t]o infringe a method claim, a person must have *practiced all steps* of the claimed method." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317 (Fed. Cir. 2009) (emphasis added). If even one element of the claimed method is not actually practiced by the accused system exactly as claimed, there is no literal infringement. *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1328 (Fed. Cir. 2008) ("The law of this circuit is axiomatic that a method claim is infringed only if each step of the claimed method is performed.").

1    Yet Dr. Rose never determined whether AT&T's network actually performs

2    each and every step of the asserted method claims.  For example, Dr. Rose's

3    infringement opinion for Claims 12, 13, 18, and 19 relies on the use of an Advice

4    of Privacy SMS.  But as discussed above in Sec. A.2, Dr. Rose did not perform

5    any testing of the AT&T network to determine if it actually sends an Advice of

6    Privacy SMS.  When asked why he did not take that step, Dr. Rose suggested that

7    it was unnecessary to do so because the system need only be capable of using

8    Advice of Privacy:

9        Q: [Y]ou said you haven't looked at the code of the system and
         played with it in preparing your report.  Why not?
10
         A: It didn't seem – you know, there's levels, right?  There's levels of
11       effort and levels of need, and the . . . ''461 [Patent], didn't need that
         level of – of depth so I guess I'm also instructed, you know, the
12       understanding is that the system needs, *in order to infringe the system
         just has to be capable of,* . . . .
13       ████████████████████████████████████

14       . . . My point is this.  That I didn't think it was necessary to go down
         to that level of detail.

15   Ex. R at 273:13-274:10 (emphasis added).  Dr. Rose's understanding that AT&T

16   can infringe these method claims even if it does not actually practice Advice of

17   Privacy—that mere capability is sufficient—runs afoul of the governing law,

18   rendering his opinion irrelevant and inadmissible.

19        Dr. Rose's opinion regarding Claim 1 of the '273 Patent suffers from a

20   similar infirmity.  As noted above in Sec. A.3, Dr. Rose admitted that he did not

21   verify whether the steps he identifies as corresponding to location storage

22   functionality recited in the claim, have ever been performed by AT&T's network:

23   "So I have no way of knowing specifically whether this particular piece of method

24   . . . or algorithm . . . was ever performed . . . ."  *Id.* at 490:7-24.  *Accord Id.* at

25   493:6-10 ("Q: Now I'm asking you does it actually do it.  A: So, you know, the

26   AT&T system, the hardware, all the wires and all that good stuff, computers, I

27   have not verified that . . . .").

28

Dr. Rose should not be permitted to offer opinions on infringement of the asserted method claims. Because he applied the wrong legal standard—"mere capability" rather than "actual performance"—his opinion regarding Claims 11, 12, 13, 18, and 19 of the '461 Patent and Claim 1 of the '273 Patent will not assist the trier of fact and should be excluded under Rule 702.

### C. Dr. Rose Did Not Employ a Reliable Methodology in Selecting the Three Items That He Concludes Are "a Code" Satisfying the Court's Construction of "Preauthorized"

Dr. Rose asserts that network-based applications are "preauthorized" within the meaning of the Court's construction because they submit an "app ID, PW, and MSISDN"—application ID, password, and the phone number of the phone whose location is requested. *See, e.g.*, Ex. N at 31. In other words, he concludes that these three items, taken together, are "a code specific to mobile device that permits a request for that device's location to be made." Dr. Rose offers no explanation, however, as to whether or why a person of ordinary skill in the art would consider three distinct items to be "a code." Nor does he provide any explanation of the methodology he used in selecting these three particular items. In other words, Dr. Rose offers no basis whatever for his opinion. Dr. Rose's failure to explain why the items he selected satisfy the construction provides a sufficient basis to exclude his opinion. *See Aristocrat Techs. v. Int'l Game Tech.*, 709 F.3d 1348, 1360-61 (Fed. Cir. 2013) (affirming exclusion of expert's testimony and rejecting the argument that an expert need only testify as to "how" a claim limitation is met and does not have to testify as to "why" it is met); *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010) ("The expert must explain the methodologies and principles supporting the opinion."); *Keegan v. American Honda Motor Co., Inc.*, 284 F.R.D. 504, 517-518 (C.D. Cal. 2012) (excluding an expert's testimony because he did not demonstrate that he followed a methodology "embraced by at least some other experts in the field").

In this case, the lack of explanation is a symptom of the larger problem. Scrutiny of Dr. Rose's opinion reveals that, in fact, no reliable methodology was applied. Rather, the three items of data were selected arbitrarily in an attempt to manufacture "a code" to sustain Enovsys's infringement allegations in the face of an unfavorable claim construction ruling.

As illustrated in the annotated image below, the three items Dr. Rose seizes upon are found within a message submitted by a network-based application, scattered in amongst a number of other items that Dr. Rose does not even acknowledge in his report or appear to understand. *See, e.g.*, Ex. R at 185:6-7 (speaking of "delay tolerant" parameter, "I don't know exactly what that means but I can imagine what it might be"), 181:6-182:1 (referring to other portions of the message as "a bunch of stuff that is not specifically relevant"). His report—which does not include or reference the image below—evidences no awareness of the format of the submitted message.



Ex.S at ATT-ENV00459966 (highlighting added).

His deposition testimony confirms that he did not consider the details of the message from which he arbitrarily selects the disparate items that make up his purported "code." Dr. Rose conceded that he did not confirm the format and contents of such a message:

> Q: And do you agree that this figure is representative of a sample message that could be submitted by a third party containing a location request to the AT&T accused system?

> A: It is – again, it seems reasonable without actually digging down in the software, God forbid. Well, you know, maybe that will be necessary, I don't know. . . . Without actually talking directly to the, you know, we have deposition testimony, we have all these documents, without actually talking directly to the AT&T folk, the engineers, it is tough for me to say unequivocally, you know, whether this is what it is and this is the format it uses. . . . I'm willing for you to say to me that that's a reasonable location request message.

Ex. R at 167:3-23. He further conceded that he does not know how the various pieces of that message are correlated or processed in AT&T's network:

> It is a packet of information and I'm not sure internally how that packet of information – so, for example, I could imagine that the, in terms of the actual code, just like the e911 services, when you make that call, the system is already trying to locate you . . . .

> Q: Well, I don't want you to imagine anything, I want you to talk about the accused AT&T system.

> A: Right.

> Q: Let's focus on that.

> A: So what I'm saying is that the implementation, I don't know what going on under the hood below, the interpretation of that message, you know, the order in which things are interpreted by the code.

*Id.* at 314:1-17. Dr. Rose even admits that he failed to "dig into" the details for two of the three specific items that he does rely on as constituting the claimed preauthorization code (*i.e.*, the application's app ID and password). *Id.* at 199:15-24 ("The details of that I didn't dig into but, you know, I'm sure, you know, we could drag an engineer or two – well, it is too late now probably, but we could look at that.").

Apart from litigation exigency, no logic or methodology whatever underlies Dr. Rose's opinion as to what constitutes a "code" for preauthorization purposes. Against the backdrop of Dr. Rose's disregard for the details of the submitted message, or even the portions of that message that he identifies as "a code," his failure to explain how he selected those portions is telling. Dr. Rose recognized that a proper methodology would require evaluating the way the accused system processed the code. *See id.* at 217:11-18 ("What you asked me is whether the credentials are part of the code . . . . [I]t really depends upon the implementation [of the system],"); *Id.* at 218:14-219:4. Fair enough, and thus does Dr. Rose himself expose the fatal flaw in his analysis: *He did not investigate how AT&T's system was actually implemented.* As further proof of the arbitrariness of his selection, Dr. Rose admits that he could have selected other portions of the message and called them a "code" instead. *See id.* at 217:18-19 ("I mean, frankly, you could look at this whole [message] as the code, you could."), 218:14-219:4 ("[O]ne could also I think take this as the code specific to the mobile as the phone number plus a bunch of other stuff.") Litigation necessity is not analysis, and opinion not supported by sound analysis and a reliable methodology is inadmissible.

Opinions based on unexplained, suspect, and ultimately litigation-driven methodology cannot withstand scrutiny under *Daubert*. *See Minasian v. Standard Chtd. Bank, P.L.C.*, 109 F.3d 1212, 1216 (7th Cir. 1997) (affirming exclusion of expert submission that exemplified "everything that is bad about expert witnesses in litigation" because it was "full of vigorous assertion . . . carefully tailored to support plaintiffs' position but devoid of analysis"); *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of

testifying"). AT&T therefore respectfully submits that the Court should exclude Dr. Rose's infringement opinions regarding the '461 Patent.

**D.  Dr. Rose's Opinion Should Be Excluded Because He Improperly Relied on Dr. Gruteser's Opinions**

Dr. Rose relies extensively on the analysis of Dr. Gruteser to support his infringement opinions. In fact, he adopts wholesale the entirety of Dr. Gruteser's report based on the unadorned statement that he agrees with Dr. Gruteser. *See, e.g.*, Ex. N at 31 ("I incorporate the analysis in Professor Gruteser's report here"); *Id.* at 7 ("I have reviewed Dr. Gruteser's Report, agree with his assertions and incorporate his analysis"). This was necessary to Dr. Rose's opinions, because he did not himself analyze any of the relevant smartphones or applications in forming his infringement opinions. Ex. R at 234:20-238:2. Dr. Rose's reliance on Dr. Gruteser's report is fatally flawed and renders his opinion unreliable.

As AT&T has detailed in a separate motion, Dr. Gruteser's opinions themselves are flawed in several respects. In particular, Dr. Gruteser is not qualified as an expert as of the relevant date. His opinions are based only on publicly available documents and observations about the user interface of representative phones rather than on any technical or scientific analysis. He lacks information about how the accused system actually operates. His methodology of selecting "representative" phones lacks scientific basis. Finally, his opinions are based on incorrect claim constructions. Dr. Rose's unsupported agreement with and adoption of Dr. Gruteser's report neither saves Dr. Gruteser's report nor supports his own.

Additionally, Dr. Rose's reliance on Dr. Gruteser is improper because he has no independent grounds to evaluate the opinions or conclusions of Dr. Gruteser. In fact, the two have never communicated about this case. *Id.* at 14:9-13 ("Q: . . . Have you ever spoken to Marco [Gruteser] about this case? A: No, not at all. Q: So not by E-mail or by phone, nothing? A: No communication of any kind."). Indeed, Envsys erected what Dr. Rose calls a "firewall" between the two

experts. *Id.* at 231:14-232:9; 239:9-240:11; 374:10-16. The only information Dr. Rose had about Dr. Gruteser's analysis was the text of Dr. Gruteser's report. *Id.*

This type of opinion bootstrapping is legally impermissible. *See, e.g., United States v. 99.66 Acres of Land*, 970 F.2d 651, 657 (9th Cir. 1992) (affirming exclusion of expert testimony where purported expert performed calculations on numbers provided by another expert that "were not independently established as valid"). Dr. Rose cannot simply base his own opinions on those of Dr. Gruteser with no independent basis for doing so. One court has summarized the issue as follows:

> As courts have repeatedly held, and can be implied from rule 702, an expert cannot merely base his opinions upon the opinions of others without having an independent basis for his opinion. *United States v. 99.66 Acres of Land*, 970 F.2d 651, 567 (9th Cir. 1992); *6816.5 Acres of Land, Etc., Rio Arriba Co., N.M. v. United States*, 411 F.2d 834, 839-40 (10th Cir. 1969); *American Key Corp. v. Cole Nat. Corp.*, 762 F.2d 1569, 1580 (11th Cir.1985); Federal Rule of Evidence 702.

*Wells Fargo Bank N.A. v. LaSalle Bank Nat. Ass'n*, No. 08-CV-1448, 2011 WL 743748, at *3 (D. Nev. Feb. 23, 2011).

Dr. Rose couches his adoption and agreement in entirely conclusory terms, without substantive evaluation or analysis. Furthermore, Dr. Rose's deposition testimony demonstrates that had no independent basis on which to evaluate Dr. Gruteser's conclusions. For instance, Dr. Rose does not know the methodology Dr. Gruteser used in reaching his opinions. Ex. R at 231:3-12 ("Q: What was the methodology that he used? A: We never spoke about it so I assume counsel gave him the same sort of, you know, instructions."). Likewise, Dr. Rose does not know how Dr. Gruteser selected the "representative" phones from which Dr. Gruteser extrapolated to reach his conclusions. *Id.* at 245:3-21 (" Q: . . . You don't know what methodology he used to select phones to evaluate? A: Well, let's put it this way. . . . so when you ask that question it triggered, my assumption is that . . . he is looking for versions that were in operation during whatever the, you know, counsel specified the timeframe we're interested in so I have to assume that

1    that figured into his thinking but I could be wrong about that, I don't know.")  Dr.

2    Rose also does not know how Dr. Gruteser selected the various operating system

3    versions that he analyzed.  *Id.* at 245:3-21 ("Q. Do you know how Dr. Gruteser

4    selected the various versions that he was going to analyze? A. No, I don't know

5    how he selected them.").

6         Without knowing what underlies Dr. Gruteser's methodology, Dr. Rose

7    could neither reliably evaluate nor rely upon Dr. Gruteser's ultimate conclusions.

8    And because Dr. Rose never spoke to Dr. Gruteser regarding this case, he likewise

9    had no opportunity to question Dr. Gruteser about his analysis and conclusions to

10   satisfy himself of their correctness.  Because Dr. Rose has no independent basis

11   for adopting Dr. Gruteser's analysis, his opinions based on Dr. Gruteser's analysis

12   should be excluded.  *Wells Fargo Bank N.A.*, 2011 WL 743748, at *3.

13   **E.    Dr. Rose's Opinion Is Conclusory and Lacks Explanation or Support**

14        Dr. Rose's opinions as to both infringement and validity of the asserted

15   patents are rife with conclusory assertions that are unsupported by any analysis or

16   explanation.    *Daubert* compels the exclusion of such threadbare testimony.

17   *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("Nothing in either *Daubert*

18   or the Federal Rules of Evidence requires a district court to admit opinion

19   evidence that is connected to existing data only by the *ipse dixit* of the expert").

20   "To be admissible under Rule 702, the expert's opinion must offer more than a

21   'bottom line.'"   *Minix*, 597 F.3d at 835; *see also Aristocrat Techs.*, 709 F.3d at

22   1360-61 (rejecting argument that district court improperly disregarded expert

23   declaration as conclusory).

24        Throughout his infringement report, Dr. Rose provides naked assertions that

25   particular claim elements are satisfied.  For instance, Dr. Rose states—without any

26   supporting analysis—that "E911 also is preauthorized to access location

27   information of a phone."  *See, e.g.*, Ex. N at 31.  Dr. Rose does not even attempt to

28   explain how E911 satisfies the Court's construction of "having a code specific to a

mobile device that permits a request for that device's location to be made." Similar assertions regarding E911 appear in Dr. Rose's analysis for all but one independent claim of the '461 Patent. In analyzing infringement of the '273 Patent, Dr. Rose asserts that AT&T performs the step of "verifying when the mobile remote unit last provided its location information" because "[t]he location server (the GW or SUPL server) checks the age of the last known location." Yet nowhere in his report does he explain what "last known location" he is referring to or where in AT&T's network it would be stored—a fact that he confirmed at his deposition. Ex. R at 384:22 ("Q: . . . Do you describe in your report where . . . in the AT&T network the last known location is stored? A: . . . Yeah, I haven't specifically said in the report where, . . . but that's a clear technical question, it has got to reside somewhere . . . .").[4]

Dr. Rose's validity report is similarly riddled with unsupported assertions. For example, AT&T's invalidity expert, Dr. Braasch, identifies in Appendices D1-12 of his report, specific portions of several prior art references that disclose the limitations of the asserted claims. Dr. Braasch explains why the references in appendices D1-12 can be combined with other prior art to render the asserted claims obvious. Dr. Rose purports to rebut—with a single sentence—Dr. Braasch's assertion that the specific portions of the 10 prior art references identified in Appendix D1 teach a particular limitation of Claim 1. Rose VR at 115 ("In my opinion, none of the references in Appendix D1 discloses or suggests [the particular limitation] . . . ."). Dr. Rose employs this same mode of explanation-free analysis for the several prior art references identified in

---

[4] *See also id.* at 394:16-23 ("Q: And I think we discussed this previously but nowhere in your report do you describe where in particular in the AT&T network a last known location is stored, correct? A: Yeah. I think we talked about it before and I don't recall in my . . . expert report on infringement, whether – it just didn't seem a level of detail that was necessary.")

Appendices D2-D12.  *See, e.g.,* Ex. D at 122, 128, 159, 285-86.   In each case, Dr. Rose's "analysis" consists of nothing more than an impermissibly bare conclusion.

Dr. Rose also asserts that the asserted patents are not obvious by concluding that secondary factors exist, without offering, relying on, or discussing *any* evidence supporting those conclusions.   Dr. Rose asserts, for example, that "Enovsys's two-step permission process has been copied by AT&T."   Dr. Rose's conclusory assertion is mere "unsupported speculation" and must be excluded. *Daubert*, 509 U.S. at 589-90.

In other instances, Dr. Rose attempts to mask his skeletal analysis by quoting or paraphrasing from the disclosure of the relevant document.   But following each such quotation, Dr. Rose provides no explanation of how the quoted portion would lead a person of ordinary skill in the art to his desired conclusion.  He merely asserts it to be so.  *See, e.g.*, Ex. D at 93 ("col. 3, ll. 15-33 [of the '159 Patent], quoted above describes to one of ordinary skill in the art [limitations (i) and (ii) of claim 1 of the '273 Patent].)"; *id.* at 60 ("other illustrative example disclosures in the draft '159 application include disclosure of a profile, checking when the system was last updated, updating the system with more recent or current location information, and tracking.").   Quotation of the evidence is no substitute for actual analysis and does nothing to bridge the "analytical gap" between the evidence and Dr. Rose's ultimate conclusion.

The sheer number of occasions where Dr. Rose resorts to conclusory, "because I say so" analysis prevents AT&T from discussing each relevant instance in this memorandum.   AT&T has identified each such instance in the attached annotated expert reports of Dr. Rose.[5]   In those instances, Dr. Rose offers no analysis for the jury to consider, and thus offers nothing that would assist the jury in understanding *why* one of ordinary skill in the art would arrive at any particular

---

[5] The portions containing those opinions are highlighted and designated as "Cncl." in the margins of those reports.

conclusion.   Dr. Rose's unsupported and "bottom line" conclusory testimony should therefore be excluded.  *Minix*, 597 F.3d at 835.

**F.     Dr. Rose Failed To Apply the Correct Legal Standards In Analyzing Invalidity**

As discussed above, expert opinions based on a faulty understanding of the governing law should be excluded under Rule 702 because they will not assist the trier of fact.  *See, e.g., U.S. Gypsum Co. v. Lafarge N. Amer.*, 670 F. Supp 2d 737, 744-45 (N.D. Ill. 2009) (precluding expert testimony where expert applied incorrect legal standard).   In analyzing the validity of the asserted patents, Dr. Rose employs an incorrect legal framework in several instances.

**1. Dr. Rose Conflates the Legal Standards for Anticipation and Priority**

To anticipate a claim of a patent, a prior art reference must disclose each limitation of the claim arranged as in the claim.  To claim priority to an earlier filing in a patent application, the earlier filing must contain a similar disclosure.  However, the standard required to support a claim for priority is *more* demanding than the standard required to support a finding of anticipation:  "[T]he description of a single embodiment of broadly claimed subject matter constitutes a description of the invention for anticipation purposes . . ., whereas the same information in a specification might not alone be enough to provide a description of that invention for purposes of adequate disclosure . . . ."  *Vas-Cath, Inc. v. Mahurkar*, 935 F.2d 1555, 1562 (Fed. Cir. 1991).

Dr. Rose turns the legal framework on its head by applying a more demanding standard for anticipation than for priority.   Dr. Rose does so by demanding significantly more disclosure from a prior art patent ("Tell") to support an argument of anticipation than he does from Enovsys's earlier-filed applications to support a priority claim.  Dr. Rose admits that Tell discloses: 1) storing a timestamp for updating location (Ex. R at 113:2-7); 2) storing specifications describing the maximum aging that location information can have (*Id.* at 118:14-119:2); and 3) that location is outdated when a time-out for that location occurs

(*Id.* at 115:23-25). Dr. Rose criticized Tell, however, for not explicitly stating that the time stamp would be used to decide if location is outdated. (*Id.* at 656:13-657:4) ("how you calculate [a time out], again it might not using the timestamp. You could imagine a timer..."). Thus, Dr. Rose concluded that Tell did not anticipate Claim 1 of the '273 Patent.

On the other hand, in determining whether that same claim is entitled to a priority date from Enovsys's earlier application, Dr. Rose was not troubled by the lack of discussion regarding a timestamp. The earlier application mentioned checking if location is "outdated" or needs to be "updated," but did not use the word "time stamp" at all. Nevertheless, Dr. Rose concluded that the application supported a claim of priority. Ex. Z at 56 ll. 20-24. ("The *only way* to determine that location is not "outdated" or needs to be "updated" is to store and use [a time stamp]." (emphasis added)).

Accordingly, Dr. Rose has applied a more lenient standard in his priority analysis (concluding that the claimed use of a time stamp to determine that information is outdated is inherently disclosed by Enovsys's disclosure of generic timing information), while demanding a higher standard to find anticipation by Tell (concluding that the identical claim limitation is not disclosed by Tell's explicit recitation of a time stamp, because "it might not us[e] the timestamp, you could imagine a timer"). Because Dr. Rose premised his opinions of no anticipation and priority on an incorrect legal standard, those opinions regarding Claim 1 of the '273 Patent should be excluded.

### 2. Dr. Rose Improperly Applies a Standard for Infringement Different from That for Invalidity

Dr. Rose also fails to apply the proper legal standard regarding infringement and invalidity of Claim 1 of the '273 Patent. It is black-letter law that "[c]laims must be interpreted and given the same meaning for purposes of both validity and infringement analyses." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001). Similarly, "[t]he inquiry as to anticipation is

symmetrical with the inquiry as to infringement of a patent*." Lewmar Marine, Inc. v. Barient, Inc.*, 827 F.2d 744, 747 (Fed. Cir. 1987). Dr. Rose's analysis disregards the well-settled legal standard.

In performing his infringement analysis, Dr. Rose concludes that information relating to a location's age "inherently" satisfies a limitation of Claim 1 of the '273 Patent. Ex. N at 130 ("[T]ime information providing an indication of *the time when location information was obtained* or updated, *or the age of the location information, is inherently used* to determine whether . . . a predetermined time interval has passed." (emphasis added)). But in performing his parallel validity analysis, Dr. Rose concludes that the location time stamps and maximum aging information discussed in the prior art Tell patent fail to satisfy that same limitation. Ex. R at 113:2-7, 118:14-119:2 (admitting that Tell discloses time stamps and maximum aging). In other words, Dr. Rose finds that the same elements disclosed in Tell *necessarily* infringe the claim limitation when allegedly found in AT&T's system, yet Tell's discussion does not invalidate that limitation. Dr. Rose cannot have it both ways. Such self-serving analysis applies a different legal standard to infringement and invalidity, which the Federal Circuit forbids. Thus, Dr. Rose's analysis of Claim 1 should be excluded as grounded on an improper legal standard.

### 3. Dr. Rose's Applies the Wrong Legal Standard for Commercial Success

Dr. Rose asserts that the commercial success of location-based services supports a finding of nonobviousness of the asserted claims. Ex. D at 316. But his assertions rely on an erroneous application of the law. Under the correct legal analysis, the commercial success of an invention supports nonobviousness only if the feature that caused the success was both recited in the claims and not found in the prior art:

> [I]f the commercial success is due to an unclaimed feature of the device, the commercial success is irrelevant. So too if the feature that creates the commercial success was known in the prior art, the success is not pertinent.

1    *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311-12 (Fed. Cir. 2006).

2           Dr. Rose fails to consider this governing legal standard.  He does not tie any

3    feature in any allegedly infringing product to any novel limitation of any asserted

4    claim.   Instead, Dr. Rose merely opines that privacy *in general* is important to

5    AT&T, and asserts that AT&T's guideline for LBS services "requires appropriate

6    informed consent from handset users."  Ex. D at 315.  But his opinion completely

7    ignores the fact that, by his own admission, location privacy was well-known in

8    the prior art.  Ex. R at 77:17-78:10 (admitting that literature describing prior art

9    ParcTab system provides "a clear indication . . . that a user might want to protect

10   their location.").   Accordingly, it is only by entirely ignoring the relevant legal

11   framework that Dr. Rose is able to reach his opinion regarding commercial

12   success.  Because his analysis on this issue disregards and is inconsistent with the

13   applicable law, it must be excluded.

14                **G.     Dr. Rose Is Not Qualified As an Expert Regarding Practice
                           Before the Patent Office**

15          Expert testimony is admissible only if "the reasoning is scientific and will

16   assist the jury." *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230 (9th Cir. 1998).

17   Testimony offered under Fed. R. Civ. Evid. 702 will "assist the jury" only when

18   the purported expert is "qualified as an expert by knowledge, skill, experience,

19   training, or education" and those qualifications "will help the trier of fact to

20   understand the evidence or to determine a fact in issue."

21          Dr. Rose has not attempted to show that he is qualified as an expert on the

22   rules and regulations governing patent prosecution before the United States Patent

23   and Trademark Office (USPTO).   Yet, in several instances, Dr. Rose's validity

24   report offers his own interpretation of the actions taken by patent examiners during

25   prosecution of Enovsys's family of patent applications.  Dr. Rose is not qualified

26   to provide such interpretations, and Dr. Rose's lay opinions therefore will not

27   assist the jury in assessing the validity of the asserted patents.

28

1       For example, Dr. Rose states that "the USPTO [in making a non-statutory
2 double-patenting rejection] expressly stated that there was no reason for Applicant
3 not to claim what is recited in the '461 patent during the '159 prosecution, *thus*
4 *implicitly agreeing* that the subject matter claimed in the '461 patent was disclosed
5 in the '159 patent." [Ex. D at 66 (emphasis added).] Dr. Rose does not explain
6 the basis for his interpretation of the implications of the Patent Office's action, but
7 that matter is certainly not within his technical expertise and is not a topic upon
8 which he is qualified to testify as an expert.[6] Elsewhere, Dr. Rose notes that prior
9 art raised in this case has been reviewed by the Patent Office in *subsequent* patent
10 applications. Dr. Rose appears to be offering an opinion about the impact the
11 Patent Office's examination of these non-asserted patents would have on the
12 asserted patents, an opinion he is not qualified to provide.

13       Dr. Rose's lay opinions regarding Patent Office procedure masquerading as
14 expert testimony will not assist the jury. Under Rule 702, Dr. Rose must be
15 precluded from opining on matters outside of his technical expertise.

16 **IV. CONCLUSION**

17       Dr. Rose's opinions on infringement and validity of the asserted patents are
18 fatally flawed and fail to satisfy Rule 702. His opinions are based on pure
19 speculation and his imagined versions of the accused system, rather than the actual
20 facts. His threadbare conclusions are arrived at through cherry-picking of the
21 evidence and a litigation-motivated methodology lacking any scientific support.
22 Enovsys cannot satisfy its burden of showing that his testimony is properly
23 admissible. The Court should therefore exercise its gatekeeping function and
24 exclude his testimony at trial.

25

26

27 [6] Dr. Rose's analysis is also substantively flawed, which is not surprising given his
lack of patent law expertise. The double patenting rejection Dr. Rose addresses
requires an *obviousness* analysis, not an analysis of written description. *See*
28 M.P.E.P. Sec. 804(II)(B)(1); Ex. AA at pg. 2.

Dated: February 28, 2014

Respectfully submitted,

BAKER BOTTS L.L.P.

/s/ Eliot D. Williams
Eliot D. Williams
Attorney for Defendants and
Counterclaimants
AT&T MOBILITY LLC and AT&T
MOBILITY II LLC